IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Cynthia Gilbert,                        :

          Plaintiff,                    :

     v.                                 :     Case No. 2:07-cv-0087

Big Sandy Furniture, Inc.,              :     JUDGE GRAHAM

          Defendant.                    :

<u>REPORT AND RECOMMENDATION</u>

     This matter is before the Court on a motion to dismiss or in
the alternative to stay proceedings and compel arbitration filed by
the defendant, Big Sandy Furniture ("Big Sandy").  The motion was
referred to the Magistrate Judge for an evidentiary hearing and a
Report and Recommendation.  The hearing was held on July 20, 2007.
Both parties filed post-hearing briefs, and the motion is ripe for
adjudication.  For the following reasons, the Court recommends that
the motion to dismiss be denied at this time and that the motion to
stay be granted.

I.

     The plaintiff, Cynthia Gilbert, was employed by Big Sandy in
Chillicothe, Ohio.  She was paid ten dollars per hour.  At the time
that Ms. Gilbert was hired, she received an employment packet that
contained a Dispute Resolution Plan ("Plan").  The Plan stated, in
pertinent part:

          The purpose of the Plan is to benefit the
          Employee  and   the   Company   by   avoiding
          litigation  and  establishing  and  gaining  the
          benefit  of  a  speedy,  impartial,  and  cost-
          effective   method   for   resolving   their
          differences.   The  Plan  is  the  required  and
          exclusive  way  to  deal  with  any  and  all
          disputes between the Company and its Employees
          (the  "Parties").   Neither  the  Company  nor  the

Employee can sue the other in any court over differences based on a Claim or Dispute arising out of or related to their employment, application for employment, personal injury, or termination of employment.

\* \* \*

**Plan Director**. The Company has appointed [Dispute Resolutions, Inc ("DSI")] as Plan Director ... to run and direct this Plan.

Powers of the Plan Director. DSI has total responsibility for the direction and running of the Plan and has the power and authority necessary to accomplish that purpose. This includes, but is not limited to, the following rights, powers, and authority:

(a) to make rules for directing and running the Plan;

(b) to interpret the Plan;

(c) to correct any defect, supply anything that has been left out, or clear up any inconsistency which may be in the Plan;

(d) to figure out all questions related to eligibility or what procedures should be followed under the Plan;

(e) to solve any problem relating to the directing or running of the Plan; and

(f) to delegate any duties of the Plan Director as the Plan Director believes are necessary to properly direct and run the Plan.

\* \* \*

**Mandatory Plan**. The Plan is the only way for Employees to solve their Differences or Disputes with the Company. Employees cannot bring a lawsuit in any court against the Company no matter what the subject of the Dispute or Difference or the seriousness of damages.

2

> \*\*\*
>
> **Controlling Law.** This plan is an arbitration agreement. This Plan shall be governed, construed and enforced according to the Federal Arbitration Act ... to the maximum extent possible. In the event of any inconsistency between this Plan and such statute, this Plan shall control to the maximum extent possible.

(Evid. Hr., Ex. D1, pp. 1, 4, 7-8).

The packet also contained an "Employee Acknowledgment" form that stated:

> I hereby acknowledge receipt of the Dispute Resolution Plan of **BIG SANDY FURNITURE, INC.** ("Company") and agree that I will immediately become familiar with its contents. I acknowledge and affirm that Ohio is an at-will employment state. As such, each party to the employment relationship (Employee and Company) retains their right to discontinue the relationship without cause or prior notice.
>
> I also understand and agree that no Employee or representative of the Company is authorized to enter into any agreement of employment for any specified period of time or to make any agreement contrary to the provisions of this Dispute Resolution Plan or any other Company policy except by written authorization signed by the Company.
>
> I further understand and agree that all disputes of any nature or manner whatsoever, including those which relate in any way to my employment or the termination of my employment, as is more fully described in the Dispute Resolution Plan, shall be resolved exclusively in accordance with the Dispute Resolution Plan which includes binding arbitration as a final step.

(Id., Ex. D3). The parties stipulated that Ms. Gilbert signed the "Employee Acknowledgment."

3

On February 6, 2007, Ms. Gilbert filed a complaint in this Court alleging, inter alia, violations of the Fair Labor Standards Act, the Ohio state law minimum wage standard, and the Ohio state law semi-monthly wage standard. All of these claims arise out of her employment with Big Sandy. The record indicates that Ms. Gilbert did not attempt to arbitrate her claims pursuant to the Plan.

II.

A motion to dismiss attacks the sufficiency of the complaint. In ruling upon such motion, the Court must accept as true all well-pleaded allegations of the complaint, and may dismiss the action only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. Conley v. Gibson, 355 U.S. 41 (1957). It is with these standards in mind that the motion to dismiss must be decided.

III.

The defendants moved to dismiss this action claiming that the parties must arbitrate this matter under the Plan. In response, Ms. Gilbert argues that the Plan (1) is illusory and lacks mutuality of obligation; (2) does not provide a fair and impartial forum where Ms. Gilbert can vindicate her rights; (3) is unconscionable because Ms. Gilbert did not knowingly and voluntarily waive her constitutional right to litigate in a court; and (4) is unenforceable because the cost provisions effectively deter Ms. Gilbert from enforcing her rights. Thus, Ms. Gilbert argues that she is not subject to the terms of the Plan.

*A. Illusory Agreement or Lack of Mutuality of Obligation*

Ms. Gilbert argues that the Plan is illusory and lacks mutuality of obligation because "Big Sandy alone is given the opportunity to discontinue the Plan by simply issuing a 'Notice of Discontinuation' thereby retaining the exclusive rights to terminate the Plan at any time." (Pl. Memo. in Opp. to Def. Mot.

4

to Dis. at p. 2).   However, a review of the record reveals that
while Big Sandy may discontinue the Plan, all pending arbitration
claims will continue to proceed regardless of the discontinuation.
Any Notice of Discontinuation which Big Sandy may issue must state,
in relevant part:

> Per Article 7.5 of the above Company's Dispute
> Resolution Plan, all employees are hereby
> notified that the referenced Plan is
> discontinued effective 30 days after the above
> date.
>
> The discontinuation of the plan shall not
> affect any claim, as defined in Article 1.3,
> if the facts giving rise to the claim occurred
> prior to the discontinuation date.
>
> The discontinuation of this plan shall not
> relieve the Company of any of its obligations
> to proceed to arbitration if requested to do
> so.

(Evid. Hr., Ex. D2).   Moreover, DSI's president and owner stated:

> Q. If, under the Big Sandy Dispute Resolution
> Plan, what happens if Big Sandy decides to
> discontinue the plan with you, what happens to
> pending claims?
>
> A. Nothing.   If they already been in place,
> they are in place and we still go forward.   It
> has no discontinuation.   If you look at 7.6,
> it says that the company may discontinue this
> plan by completing a notice of
> discontinuation, but that would have no - that
> would have no effect on any ones that are
> pending.
>
> ***
>
> Q. So, if Ms. Gilbert were to invoke her right
> under the Big Sandy Dispute Resolution Plan,
> and then at some point after that the plan was
> discontinued by Big Sandy, that would not
> affect her claim, correct?
>
> A. None whatsoever.

5

(Evid. Hr. Tr. at pp. 16-18).  Thus, because all pending claims would still be arbitrated under the Plan if the Plan was discontinued, the Court rejects Ms. Gilbert's argument that the Plan is illusory or that it is lacking in mutuality of obligation.

### B. Fair and Impartial Forum

Ms. Gilbert contends that because DSI and Big Sandy have a contract requiring DSI to arbitrate all of Big Sandy's employee-related problems, DSI cannot provide a fair and impartial forum. For support, she cites <u>Floss v. Ryan's Family Steak House, Inc.</u>, 211 F.3d 306 (6th Cir.2000).  When discussing the potential bias in selecting an arbitral forum when there is a contractual relationship between the employer and the arbiter, the <u>Floss</u> court stated:

> We have serious reservations as to whether the arbitral forum provided under the current version of the [dispute resolution administrator's] Rules and Procedures is suitable for the resolution of statutory claims.  Specifically, the neutrality of the forum is far from clear in light of the uncertain relationship between Ryan's and [the dispute resolution administrator].  Floss and Daniels suggest that the [dispute resolution administrator] is biased in favor of Ryan's and other employers because it has a financial interest in maintaining its arbitration service contracts with employers.  Though the record does not clearly reflect whether [the dispute resolution administrator], in contrast to the American Arbitration Association, operates on a for-profit basis, the potential for bias exists.  In light of [the dispute resolution administrator's] role in determining the pool of potential arbitrators, any such bias would render the arbitral forum fundamentally unfair.
>
> * * *
>
> Though we have concerns with both the fee

6

> structure and potential bias of [the dispute
> resolution administrator's] arbitral forum, we
> need not decide whether these deficits prevent
> the arbitration of Floss and Daniels's
> statutory claims.

Id. at 314.  Thus, while the Floss court had "concerns" about the
contractual relationship between the employer and the arbiter, the
court did not outright reject these types of arrangements.

However, the Court of Appeals did examine a similar
relationship in Walker v. Ryan's Family Steakhouse, Inc., 400 F.3d
370, 386 (6th Cir.2005).  The court stated:

> The record in this case removes any of the
> uncertainties surrounding the relationship
> between Ryan's and [the dispute resolution
> administrator] that the Court noted in Floss.
> [The dispute resolution administrator] is
> clearly a for-profit business, and Ryan's
> annual fee accounted for over 42% of [the
> dispute resolution administrator's] gross
> income in 2002.  Given the symbiotic
> relationship between Ryan's and [the dispute
> resolution administrator], Ryan's effectively
> determines the three pools of arbitrators,
> thereby rendering the arbitral forum
> fundamentally unfair to claimants who are
> applicants or employees.  See Geiger [v.
> Ryan's Family Steakhouse], 134 F.Supp.2d [985
> (S.D. Ind. 2001)] at 995 (holding that there
> is a strong potential for bias in the
> selection of the arbitration panel because
> [the dispute resolution administrator]
> receives payment for its agreements with
> various employers to provide a forum for
> resolving employment disputes, but not
> comparable payment is made by or received from
> an employee for agreeing to submit to the
> forum; further holding that [the dispute
> resolution administrator's] full authority to
> select both the Rules for arbitration as well
> as the pools of potential arbitrators,
> combined with [the dispute resolution
> administrator's] potential bias in favor of
> employers like Ryan's, rendered it "unlikely
> that applicants/employees will participate in

7

an unbiased forum")

Id. at 386 (some citations omitted).

Regarding the relationship between DSI and Big Sandy, the DSI president stated:

> Q. Okay. And what percentage would you estimate of your revenue comes from your contractual arrangement with Big Sandy?
>
> A. Okay. As I mentioned earlier, I have two programs. As my clients pay me a monthly fee for the 800 service for the employees, they represent about 4 percent. But as a total revenue to DSI, there is no way to estimate that. It would be less than 1 percent because we receive calls every day from people that we are named as the administrator for the ADR program, and I am in countless ERISA documents, ADR agreements and insurance policies. So, I have no idea how much total, but as far as the fee-based 1-800-line for the employees to call, that's about 4 percent.
>
> Q. How many clients would you estimate that you have, the number of clients that you have that you have this fee-based 800 monthly arrangement like Big Sandy?
>
> A. 65 currently.
>
> ***
>
> Q. Can you tell me a little bit how the process of the selection of the arbitrators would work under the Big Sandy Dispute Resolution Plan?
>
> A. Yes. Much like any other administrator, we bring a panel of either mediators or arbitrators, depending upon what stage we are in to each counsel and ask them to - depending upon the size of the case or depending upon where we are at - we will give them a list. It can be as many as five. Usually, if they request more, we usually give them three to five, depending upon where we are at and what

8

counsel seems to be happy with.  And then we ask them to rate - to strike one, if it is three, rate the other two and then whoever gets the best score is going to be the mediator or the arbitrator.

We also prescreen all of our arbitrators and mediators to make sure  that they are qualified, that they are attorneys or retired judges or sitting judges, to make sure that they are trained in what we are trying to do, and if they have a history of success.  We don't want to bring novices to the table.  We want to bring somebody who can bring fairness and a history of success to the table.

Q. If the parties aren't able to agree on the arbitrator under the Big Sandy Plan, what happens then?

A. Usually, we will go back and send - as a rule - this hasn't happened a lot, but as a rule, a lot of the times, depending upon how both sides are getting along with us, we will ask them for their suggestions.  Especially if we don't have a panel already in the area, we will ask them for their suggestions as far as who they would recommend.  A lot of times the panel is somebody who both sides have pretty much agreed upon.  But if they do not decide or cannot decide, we will send them another panel.  After the second panel, if they can't decide, the plan actually states that DSI, much like AAA or Jams, will decide based upon the ratings that have been given to us by both sides.

(Evid. Hr. Tr. at pp. 11-14).

Based on the evidence in the record, the Court concludes that the contractual relationship between DSI and Big Sandy does not pose the same threat of potential biased arbitration that Walker and possibly Floss possessed.  Big Sandy accounts for less than 1% of DSI's mediation and arbitration business.  This amount is significantly smaller than the 42% of business Ryan's gave its

9

dispute resolution administrator in <u>Walker</u>.  Further, it appears
that DSI provides a sufficient mechanism to ensure that both
parties are satisfied with their mediator or arbiter. This is not
a situation where an unwanted arbiter or mediator is forced on an
unwilling party.  <u>Cf.</u> <u>Walker</u>, 400 F.3d at 387 (identifying bias
against employees due to the lack of requirements for potential
arbiters).  Both parties have opportunity to evaluate and screen
potential arbiters and mediators.

While the Court is concerned with any economic ties a dispute
resolution company has with an employer when it comes to providing
a fair and impartial arbitration environment, this situation does
not appear to be one which undue economic pressure on the dispute
resolution administrator is overriding the possibility of a fair
and impartial arbitration for an employee or applicant.  Thus, the
Court rejects the argument that the agreement between DSI and Big
Sandy fails to provide a fair and impartial forum.

*C. Knowing and Voluntary Waiver*

Ms. Gilbert argues that the Plan is unconscionable because she
did not knowingly and voluntarily waive her constitutional rights
to a court trial.  For support, Ms. Gilbert contends that she had
no bargaining power when signing the Plan because she would not
have been hired if she did not sign it.  Moreover, Ms. Gilbert
claims that the Plan was "9 pages of legalese that no average lay
person could possibly fully comprehend without the aid of some
further explanation." (Pl. Post Evid. Hr. Br. at p. 12).

Under the Federal Arbitration Act, generally available
contract defenses such as duress, fraud and unconscionability may
be applied to invalidate an arbitration agreement. <u>Burden v. Check
into Cash of Kentucky</u>, 267 F.3d 483, 492 (6th Cir.2001)(citing
<u>Doctor's Associates, Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996)).
However, as to the waiver of the right to a jury trial because of
unconscionability, "the loss of the right to a jury trial is a

10

necessary and fairly obvious consequence of an agreement to arbitrate." Id. (citing Sydnor v. Conseco Fin. Servs. Corp., 252 F.3d 302, 307 (4th Cir.2001)).

In Ohio, the unconscionability doctrine has two components: (1) substantive unconscionability, i.e. unfair and unreasonable contract terms and (2) procedural unconscionability, i.e. individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible. Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 666 (6th Cir.2003). In determining procedural unconscionability, a court should examine such factors such as age, education, intelligence, business acumen and experience. Id. (citing Cross v. Carnes, 132 Ohio App.3d 157, 170 (11th Dist.1998). Both components must be present to find a contract unconscionable.

In this case, it appears that Ms. Gilbert has failed to prove that the Plan is unconscionable. Primarily, the Court refers to the "Employee Acknowledgment" Form that stated, in relevant part:

> I further understand and agree that all disputes of any nature or manner whatsoever, including those which relate in any way to my employment or the termination of my employment, as is more fully described in the Dispute Resolution Plan, shall be resolved exclusively in accordance with the Dispute Resolution Plan which included binding arbitration as a final step.

(Evid. Hr., Ex. D3). This clear and concise language demonstrates that any dispute relating to employment must be resolved in the manner outlined in the Plan. Ms. Gilbert signed and dated this Form, indicating that she received it and understood that her employment disputes are governed by the Plan. By acknowledging that she understood the Plan and its terms, which included binding arbitration, Ms. Gilbert knowingly and voluntarily waived her right to a jury trial, which is an obvious consequence of signing a

dispute resolution agreement.  Further, the language in the Plan concerning dispute resolution and binding arbitration is written in plain and understandable terms, and there is no evidence that Ms. Gilbert was not capable of understanding this language had she read it.

Moreover, while the record indicates that Ms. Gilbert thought the Plan was an "open door policy to management," nothing in the record reveals that she asked any questions regarding what she was signing, nor did she allege that she received false information regarding the Plan.  The record is also void on any relevant information that could allow the Court to conclude that she lacked intelligence, or any other educational or business experiences, which could make the Plan unconscionable.  Thus, the Court concludes that the Plan was not an unconscionable contract.

### D. Cost-Splitting Provisions

In Ms. Gilbert's final argument, she claims that the cost-splitting provisions in the Plan render it unenforceable. Specifically, Ms. Gilbert contends that under the terms of the Plan, she is responsible for bearing one-half of the financial burden associated with the binding mediation or arbitration. Therefore, Ms. Gilbert argues that because she cannot afford to arbitrate under the Plan, the Plan is unenforceable.  In response, Big Sandy highlights a provision in the Plan indicating that Big Sandy, not an employee or applicant, bears the financial burden of binding mediation or arbitration if the employee or applicant is indigent and cannot afford to pay for the arbitration or mediation.

The Court of Appeals has held that if "the splitting or sharing of the costs of the arbitral forum under a particular arbitration agreement effectively prevents the vindication of a plaintiff's statutory rights, those rights cannot be subject to mandatory arbitration under the agreement." Morrison, 317 F.3d at 658.  A court must use a case-by-case approach when determining

12

whether a cost provision in an arbitration agreement denies an employee or applicant the opportunity to vindicate their rights. Id. at 659.  The party wishing to invalidate an arbitration agreement on the grounds that the agreement is prohibitively expensive bears the burden of proving the likelihood of incurring such costs.  Id.

The Sixth Circuit Court of Appeals has articulated several factors a reviewing court must consider when evaluating a cost provision in an arbitration agreement.  First, "a court considering whether a cost-splitting provision is enforceable should consider similarly situated potential litigants, for whom costs will loom as a large concern ...."  Id. at 663.  When examining this factor, "the court should define the class of such similarly situated potential litigants by job description and socioeconomic background."  Id. at 663-64.

Second, the reviewing court should examine the average cost of a typical arbitration or mediation.  Id. at 664.  The court should also review the cost of litigation as the alternative to arbitration.  Id.  The Court of Appeals stated:

> In many, if not most, cases, employees (and former employees) bringing discrimination claims will be represented by attorneys on a contingency-fee basis.  Thus, many litigants will face minimal costs in the judicial forum, as the attorney will cover most of the fees of litigation and advance the expenses incurred in discovery.  Thus, in many cases it might be concluded that, considering the costs incurred by the employee litigant, there is little or no difference between the expenses of the judicial and arbitral fora - with one important exception.  In the arbitral forum, the litigant faces an additional expense - the arbitrator's fee and costs - which are never incurred in the judicial forum.

Id.

Finally, "the reviewing court should discount the

13

possibilities that the plaintiff will not be required to pay costs or arbitral fees because of ultimate success on the merits, either because of cost-shifting provisions in the arbitration agreement or because the arbitrator decides that such costs or fees are contrary to federal law." <u>Id.</u>

In the instant case, the Court notes that the class of potential litigants likely includes Big Sandy cashiers or office managers. However, other than the fact that Ms. Gilbert makes $10/hour, there is nothing in the record regarding her socioeconomic background or additional financial resources, nor is there any information regarding the socioeconomic background of other potential litigants. In fact, the record is void of any information regarding other similarly-situated Big Sandy employees.

Moreover, while the record does indicate that the average cost of DSI arbitration is $750-$2500/day, there is a provision in the Plan that allows an employee or applicant to claim indigent status. Thus, if that status is granted, Big Sandy, not the employee or applicant, would bear the financial burden. The Plan states:

> In no event shall an Employee lose the right to mediation or arbitration due to financial inability to pay mediation or arbitration costs. If an Employee is unable to pay for mediation or arbitration, the costs shall be borne by the Employer.

(Evid. Hr., Ex. D1). According to the DSI President, there has never been an incident where a mediation or arbitration did not go forward because the employee or applicant could not afford to pay their respective share. (Evid. Hr. Tr. at pp. 16).

Finally, the Court notes that there is no cost-splitting provision that allows a meritorious employee to forego paying his or her one-half of the arbitration fee. However, it appears in this case that, given Ms. Gilbert's argument that she cannot afford to pay for mediation or arbitration, this is not a situation where

14

she would likely be required to pay.

Thus, there is no evidence in the record for the Court to examine the Plan's affect on potential litigants. Further, because of the "inability to pay" provision in the Plan, Ms. Gilbert has an opportunity to proceed with mediation and arbitration by having Big Sandy pay the acquired fees. According, because of the lack of evidence and the "inability to pay" provision, the Court concludes that the Plan is enforceable.

On a final point, the Court notes that Ms. Gilbert has not exercised her rights under the Plan to claim that she is a pauper and unable to pay for the mediation and arbitration. It is therefore appropriate to stay this proceeding and instruct Ms. Gilbert to request pauper status from DSI. If DSI concludes that Ms. Gilbert is a pauper and unable to pay her share of the fees, the cost-splitting provision is irrelevant and the case will be dismissed. However, if DSI concludes that Ms. Gilbert is able to pay for mediation and arbitration, the Court will re-examine the motion in light of the <u>Morrison</u> factors.

IV.

Based on the foregoing, the Court RECOMMENDS that the defendant's motion to dismiss (doc. #7) be DENIED. The Court RECOMMENDS that the motion to stay proceeding and compel arbitration (doc. #7) be GRANTED and that the case be stayed pending DSI's evaluation of whether Ms. Gilbert qualifies as a pauper.

<u>PROCEDURE ON OBJECTIONS</u>

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u>

15

determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).


/s/ Terence P. Kemp
United States Magistrate Judge

16